**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **MAYER HOFFMAN McCANN P.C.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:08-CV-00574-GAF** |
| | ) | |
| **THOMAS L. BARTON, et. al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## FINDINGS OF FACT

### *The Parties and Their Relationship*

1.      Plaintiff Mayer Hoffman McCann P.C. ("MHM") is a professional corporation organized in the state of Missouri.  MHM is a national Certified Public Accounting ("CPA") firm with 38 offices.

2.      Defendants Thomas L. Barton, Anthony W. Krier, James N. Stelzer and John C. Walter are Certified Public Accountants ("CPAs"), licensed by the State of Minnesota to practice public accountancy.

3.      CBIZ, Inc. is a public company that provides services including financial services, some accounting services, employee services and technology solutions.  CBIZ Accounting, Tax & Advisory, LLC ("CBIZ ATA") is a subsidiary of CBIZ, Inc.

4.      CBIZ BVKT, LLC ("CBIZ BVKT"), is a Delaware corporation which had its office in New Hope, Minnesota.

5.      From at least 1998 until August 15, 2005, all four defendants were employees of the accounting firm Bertram, Vallez, Kaplan & Talbot ("Bertram Vallez") located in New Hope, Minnesota.

6.      In 1998, Bertram Vallez entered into an administrative services agreement with a predecessor to CBIZ, Inc.[1]  Bertram Vallez operated under an alternative practice structure in which Bertram Vallez agreed to provide only attest services and CBIZ performed non-attest services.  As per the administrative services agreement, Bertram Vallez paid an administrative service fee 85% of its attest revenues to CBIZ.

7.      In 2004, MHM President Bill Hancock met with defendants to discuss joining MHM.  Defendants had additional discussions with management of CBIZ and made it known that they did not want to move from their location in New Hope, Minnesota to a downtown Minneapolis location.  No binding agreement was reached regarding future office location.  At least one of the Bertram Vallez members, Tim Talbot, understood that the firm's office would remain in New Hope for a period of three years from the time they joined MHM.

8.      On August 15, 2005, MHM entered into a series of agreements with defendants, Bertram Vallez, and CBIZ BVKT.  MHM would not have agreed to permit defendants to become shareholders of MHM if any of the four agreements had not been executed.

9.      The first agreement was a Termination Agreement between Bertram Vallez and MHM.  Under the Termination Agreement, Bertram Vallez agreed to halt its practice of public accountancy in exchange for MHM's agreement to provide accounting

---

[1] The 1998 administrative services agreement is between Century Business Services, Inc. (now known as CBIZ, Inc.), BVKT Acquisition Corp. (which became CBIZ BVKT), and Robert C. Bertram and Associates, Ltd. (which became Bertram Vallez).

services to the Bertram Vallez clients.  MHM also agreed to include Bertram Vallez as a predecessor company on its professional liability insurance so that defendants continued to receive insurance coverage for acts that occurred during the time they worked for Bertram Vallez.

10.     Bertram Vallez filed its Articles of Dissolution in January 2007.  The only remaining property owned by Bertram Vallez was cash.

11.     MHM, CBIZ, Inc., and CBIZ BVKT entered into the second agreement, an adoption agreement to adopt the Restated Administrative Services Agreement.  Under the Restated Administrative Services Agreement, MHM and CBIZ agreed to provide services under an alternative practice structure.  MHM agreed to provide only attest services and CBIZ performed non-attest services.  Under the agreement, MHM pays an administrative service fee of  85% of its attest revenues to CBIZ.

12.     Providing services under an alternative practice structure gives MHM access to capital for growing a national quality audit practice while maintaining the ability to provide other services to clients.  The alternative practice structure also provides MHM with access to technology and marketing.

13.     The American Institute of Certified Public Accountants ("AICPA") adopted the alternative practice structure as part of its code of ethics in 1999.  The alternative practice structure has been generally accepted as a business model.  The Public Company Accounting Oversight Board ("PCAOB") has inspected MHM in 2004 and 2007.  The PCAOB has raised no concerns about the alternative practice structure. The Securities and Exchange Commission has accepted the use of the alternative practice structure.

14. Pursuant to the third agreement, a Subscription and Affiliation Agreement, each defendant purchased 1,000 shares of stock in MHM.

15. On August 15, 2005, each defendant entered into the fourth agreement with MHM, the Stockholder's Agreement. Defendants Stelzer and Walter later executed a 2006 Amendment to Stockholder's Agreement of Mayer Hoffman McCann P.C.

16. Upon joining MHM, defendants became employees (as well as shareholders) of MHM. They received an increase in their salary from CBIZ BVKT to replace income they had received from Bertram Vallez.

17. During the year leading up to defendants' joining MHM, MHM agreed to participate in making payments owed by Bertram Vallez to a former Bertram Vallez partner.

18. By signing the Stockholder's Agreement and other agreements on August 15, 2005, defendants received the benefits of operating as a national CPA firm, access to resources of a national firm, the ability to market themselves as a national CPA firm providing audit services, opportunity to participate in national level training programs, and the ability and resources to pursue growth in their attest practice. (Exh. 1, Tr. 35:16-36:12.)

19. The Stockholder's Agreement provides that the agreement is identical to the agreements executed by MHM and other shareholders. This agreement gives shareholders the security that departing shareholders will not solicit clients or employees and will not disclose certain information. It also provides the security that all shareholders are bound by the same restrictions. (Exh. 25 Hancock 8/29/08 Dep. 70:10-71:10.)

20.    Under the Stockholder's Agreement, subject to certain conditions, MHM agreed to repurchase the shares of Common Stock from each defendant upon termination of the Shareholder's employment with MHM.  (Exhs. 12, 13, 14 and 15.)

21.    In exchange for the benefits of joining MHM and MHM's agreement to re-purchase shares upon termination of employment, each defendant agreed not to solicit customers of MHM during the Post-Employment Restrictive Period; agreed not to solicit MHM employees; and agreed not to copy, disseminate or use MHM's confidential information at any time.  (Exhs. 12, 13, 14 and 15, §§ 5.1, 5.2, 5.3.)  The Post Employment Restrictive Period under section 5.1 is defined as the post employment period during which the non-competition provision of the Shareholders' Executive Employment Agreement or other contractual arrangements with CBIZ or its affiliates applies.

22.    Under Section 6.3 of the Stockholder's Agreement, the rights and obligations of the parties are governed by, and construed and enforced in accordance with, the laws of the State of Missouri.  (Exhs. 12, 13, 14 and 15.)

*Formation of BWK/Defendants' Departure from MHM*

23.    During the period 2005 to 2008 and continuing, MHM also occupied an office in downtown Minneapolis, about 15 miles from the New Hope office.

24.    In the fall of 2007, defendants learned that CBIZ planned to consolidate the New Hope office with its Minneapolis office.

25.    On April 11, 2008, while still employed with MHM and CBIZ BVKT, defendants formed an entity under the name "Glennco, LLC."  (Exh. 3, Barton 8/29/08 Dep. 30:6-23; Exh. 5, Stelzer 8/28/08 Dep. 20:6-8.)  Defendants formed Glennco, LLC

in anticipation of departing from MHM.  On August 4, 2008, the name "Glennco, LLC" was changed to "Barton, Walter & Krier, LLC" ("BWK").  Defendants are currently members of BWK.

26.     On August 1, 2008, defendants left resignation letters on the desk of Tim Talbot, the Managing Director of the CBIZ BVKT office in New Hope, Minnesota resigning their employment with CBIZ BVKT.

27.     Defendants sent letters resigning their employment with MHM by Federal Express for delivery on Monday, August 4, 2008 to William L. Hancock, President of MHM.  The letters, which were dated August 1, stated the defendants' resignations were effective as of 5:00 p.m. on August 1, 2008.

28.     Within weeks after the departure of Defendants, the New Hope office of MHM combined with the Minneapolis office

29.     The consolidation of offices was the principal reason for defendants' resignations.  Defendants feared that employees and clients would not move with them when the firm consolidated offices.  (Exh. 3, Barton 8/29/08 Dep. 32:21-33:7; Exh. 4, Krier 8/29/08 Dep. 28:9-17; Exh. 5, Stelzer 8/28/08 Dep. 41:7-42:12; Exh. 6, Walter 8/28/08 Dep. 18:19-21:1.)

30.     Invoking the Stockholder's Agreement in their resignation letters, defendants tendered their shares in MHM for purchase by the firm.  (Exhs. 21, 22, 23, 24.)

31.     MHM has made a down payment on the amount owed and executed notes payable to the four defendants for the remainder to be paid as provided by the Stockholder's Agreement.

32.     The Stockholder's Agreement provides that defendants will not directly or

indirectly solicit, attempt to solicit or compete with MHM with respect to customers

during and after employment with MHM as follows:

5.1 <u>Non-competition.</u>

The Shareholder agrees that during the period in which the
Shareholder is employed by the Company and during the Post-
Employment Restrictive Period the Shareholder shall not, without the
prior written consent of the Company, either directly or indirectly, solicit,
attempt to solicit, take away, attempt to take away, or otherwise interfere
with the Company's relationship with any customer (including any
customer in the Company's data base) or Qualified Prospective Customer
of the company, or otherwise compete with the company with respect to
any customer or Qualified Prospective Customer.  For purposes of this
Agreement, the term "Qualified Prospective Customer" shall mean any
person, organization or other entity to which the Company as part of its
marketing or sales efforts has submitted a proposal for attest services at
any time during the twelve-month period prior to the termination of
Shareholder's employment with the Company.  The "Post-Employment
Restrictive Period" is the post employment period during which the non-
competition provision of the Shareholders' Executive Employment
Agreement or other contractual arrangements with Century Business
Services, Inc. and/or its Affiliates ("CBIZ") applies.  In the event the
shareholder has not executed an Executive Shareholder Agreement or
other contractual arrangements with CBIZ, the "Post Employment
Restrictive Period" shall be the period designated by the shareholder's
previous CPA Firm's non-competition agreements.  If no "Post-
Employment Restrictive Period" has been designated by the shareholder's
Executive Shareholder Agreement or other contractual arrangements with
CBIZ, or by the shareholder's previous CPA Firm, a minimum of two
years shall apply.

The foregoing restriction shall be in addition to any restrictions
placed upon the Shareholder  by any agreement or understanding which
the Shareholder may have with CBIZ; and nothing herein shall be
construed as a limitation upon any non-competition restriction imposed
upon the Shareholder under any agreement or understanding which the
Shareholder may have with CBIZ.

(Exhs. 12, 13, 14 and 15.)

33.     In August 1998, Defendant Barton executed an Executive Employment

Agreement with BVKT Acquisition Corp. (now known as CBIZ BVKT) and Century

Business Services, Inc. (now known as CBIZ, Inc.), which provides that an executive

shall not directly or indirectly compete or call upon any clients in a specified territory

for a period of five years.  (Exh. 29 § 6; Exh. 3, Barton 8/29/08 Dep. 16:5-17:2.)  The

"Restriction Period" in the Executive Employment Agreement is during employment

and five years thereafter.  (Exh. 29 § 6.)  Thus, the Post-Employment Restrictive Period

under the MHM Stockholder's Agreement is five years for Mr. Barton.  Nevertheless,

the Court finds that MHM represented at trial that it would only seek enforcement of Mr.

Barton's restrictive covenant for two years and that the logistics of policing the

agreement of varying lengths between partners of the same firm warrants enforcement of

Barton's covenant for two years rather than five.

34.     Defendants Krier, Stelzer and Walter each entered into a Confidentiality

and Non-Solicitation Agreement ("Confidentiality Agreement") with CBIZ BVKT,

dated December 31, 2003, August 17, 2003, and January 30, 2004, respectively.  (Exhs.

30, 31, 32; Exh. 4, Krier Dep. 8/29/08 9:18-10:1; Exh. 5, Stelzer 8/28/08 Dep. 57:24,

58:3-18; Exh. 6, Walter 8/28/08 Dep. 36:22-37:11.)  The "Restricted Period" under the

Confidentiality Agreement is during employment and two years thereafter.  (Exhs. 30,

31, 32 § 3.)  Thus, the Post-Employment Restrictive Period is two years for Messrs.

Stelzer, Walter and Krier.

35.     In preparation for starting their new practice at BWK, in July 2008,

defendants asked a former CBIZ administrative assistant, Ann Thurston, to type a one-

page letter addressed "To our valued Clients and Friends" dated August 2, 2008

("Valued Clients" letter) which enclosed engagement letters for their new business and disengagement letters from MHM. (Exh. 34, Thurston Dep. 24:6-20, 28:13-21.)

36.     From August 2 through August 6, 2008, defendants personally called on a number of MHM clients, and provided them with an engagement letter (to engage BWK), a disengagement letter (to disengage MHM), and the Valued Clients letter. (Exh. 17, Barton 1/16/09 Dep. 40:9-19; Exh. 5, Krier 8/29/08 Dep. 12:18-13:2; Exh. 19, Stelzer 1/15/09 Dep. 49:13-20; Exh. 20, Walter 1/15/09 Dep. 28:3-14.)

37.     During this same time, defendants emailed and/or faxed the three letters to additional MHM clients. (Exh. 5, Stelzer 8/28/08 Dep. 135:12-15; Exh. 6, Walter 8/28/08 Dep. 96:2-20.) The e-mail addresses and fax numbers were obtained from Outlook contacts stored on CBIZ or MHM computers. (Exh. 5, Stelzer 8/28/08 Dep. 135:21-136:11.)

38.     Defendants admit they provided the letters in the belief that the MHM clients would become clients of BWK. (Exh. 37, Barton Aff. ¶ 3; Exh. 38, Krier Aff. ¶ 3; Exh. 39, Stelzer Aff. ¶ 3; Exh. 40, Walter Aff. ¶ 3.)

39.     The "Valued Clients" letter states that defendants have resigned as Partners of Mayer Hoffman McCann P.C and that they "decided to form our own firm." (Attachments to Exhs. 37, 38, 39 and 40.) The letter further states,

> It is my hope that you will join me at our new firm. In order to make the transition at this time I am providing you with a termination letter to end your relationship with CBIZ and an engagement letter to begin a new relationship with Barton, Walter, & Krier, LLC.

(Exhs. 37, 38, 39 and 40.) The letter also exhorts the clients: "Please do not contact CBIZ to discuss this matter."

40.     The engagement letters stated,

This letter is to confirm we are engaging Barton, Walter & Krier, LLC, Certified Public Accountants to provide us with accounting, tax and/or consulting services for the above listed entities and/or individuals. A detailed letter summarizing the specific services to be provided by the firm will be agreed to in the near future. It is our intention that the firm will be engaged to complete financial statements, tax engagements, tax consulting or other business consulting as necessary.

(Exh. 35; Exh. 33, Konopka Decl. ¶ 5)

41.     From August 1 to 15, 2008, Mr. Stelzer collected the disengagement letters from clients and sent them to Tim Talbot at MHM on August 20, 2008, days before the MHM office was scheduled to re-locate.

42.     Mr. Krier has solicited somewhere between 10 and 50 clients, including MHM clients. (Exh. 4, Krier 8/29/08 Dep. 12:10-17, 83:13-15.)

43.     Mr. Krier solicited clients by telling them that he had resigned from CBIZ BVKT and MHM and that he was opening a new office, and he asked if the clients wished to engage the new firm to perform their public accounting services. (Exh. 4, Krier 8/29/08 Dep. 12:18-24.)

44.     Between August 1 and August 7, 2008, Mr. Walter asked approximately 25 people to do business with BWK, several of whom have multiple relationships with CBIZ BVKT and/or MHM. (Exh. 6, Walter 8/28/08 Dep. 24:16-25:11.)

45.     In response to a request to identify each former or current MHM client with which each defendant communicated or from which each defendant attempted to solicit or solicited business, each defendant provided an identical list attached to Answers to Interrogatories as Exhibit A. (Exhs. 41, 42, 43 and 44.)

46.     At trial, each defendant admitted that he had signed an agreement with MHM that he would not solicit business from MHM clients but that upon leaving MHM, each in fact did solicit MHM clients.

47.     Mr. Stelzer testified that the relationship between the accountant and the client is significant and almost immeasurable.  He further testified that in a smaller accounting practice, the client has a relationship with the individual and not with the accounting firm.

48.     Each defendant knowingly and intentionally breached the Stockholder's Agreement by soliciting MHM's clients.

*Solicitation of Employees*

49.     Under Section 5.2 of the Stockholder's Agreement, defendants agreed that they would not solicit or attempt to solicit employees of MHM to terminate their relationships with MHM as follows:

5.2     Nonsolicitation.

The Shareholder agrees that he shall not at any time (whether during or after the Shareholder's termination of employment with the Company), without the prior written consent of the Company, either directly or indirectly (i) solicit (or attempt to solicit), induce (or attempt to induce), cause or facilitate any employee, director, agent, consultant, independent contractor, representative or associate of the Company to terminate his, her or its relationship with the Company, or (ii)  solicit (or attempt to solicit), induce (or attempt to induce), cause or facilitate any supplier of services or products to the Company to terminate or change his, her or its relationship with the Company, or otherwise interfere with any relationship between the Company and any of the Company's suppliers of products or services.

(Exhs. 12, 13, 14 and 15.)

50.     At trial, all four defendants admitted that they solicited four MHM employees to work for BWK.

51.     On Friday, August 1, 2008, defendant Stelzer met with Lori Clark, an MHM employee, and two other former CBIZ BVKT employees.  Mr. Stelzer offered jobs to Ms. Clark and the two others.  (Exh. 34, Thurston Dep. 25:1-25.)  Ms. Clark received a letter offering employment with BWK.  (Exh. 45.)

52.     On Saturday, August 2, 2008, defendants held a meeting to solicit additional CBIZ BVKT and MHM employees to become employees of BWK.  (Exh. 4, Krier 8/29/08 Dep. 51:16-22; Exh. 46, Bolson Dep. 44:21-45:8; Exh. 6, Walter 8/28/08 Dep. 21:2-22:21.)

53.     Ms. Bethke and Mr. Klemmensen, both MHM employees, attended the August 2, 2008 meeting.   (Exh. 6, Walter 8/28/08 Dep. 21:2-22:21.)

54.     During the meeting on August 2, 2008, the BWK partners presented these employees letters of employment to become employees of BWK.  (Exh. 5, Stelzer 8/28/08 Dep. 79:5-10.)  The employees were offered approximately the same salary as their salary at CBIZ BVKT or MHM.  (Exh. 5, Stelzer 8/28/08 Dep. 113:7-14.)  Ms. Bethke and Mr. Klemmensen each received a letter offering employment with BWK.  (Exh. 45.

55.     Defendants intended to offer employees substantially the same compensation they would receive after the MHM office consolidated with the Minneapolis office.

56.     Defendant Stelzer contacted Ms. Brown, another MHM employee, by telephone on Saturday, August 2, 2008 and asked her to join their new firm.  (Exh. 47, Brown Dep. 28:8-21, 31:7-19; Exh. 5, Stelzer 8/28/08 Dep. 31:22-32:17.)

57.     Mr. Stelzer e-mailed an offer of employment to Ms. Brown the next day; Ms. Brown accepted the offer to work for BWK.  (Exh. 47, Brown Dep. 19:4-25; Exh. 45.)

58.     Each defendant knowingly and intentionally breached the Stockholder's Agreement by soliciting MHM's employees.

<em>MHM's Confidential Information</em>

59.     Under Section 5.3 of the Stockholder's Agreement, defendants agreed that they would not copy or improperly use confidential information:

5.3     <u>Nondisclosure</u>.

The Shareholder agrees that he shall not at any time (whether during or after the period of his employment with the Company) directly or indirectly copy, disseminate or use, for the Shareholder's personal benefit or the benefit of any third party, any Confidential Information, regardless of how such Confidential Information may have been acquired, except for the disclosure of such Confidential Information as may be (i) in keeping with the performance of the Shareholder's employment duties with the Company, (ii) as required by law, or (iii) as authorized in writing by the Company.  For purposes of this Agreement, the term "Confidential Information" shall mean all information or knowledge belonging to, used by, or which is in the possession of the Company relating to the Company's business, business plans, strategies, pricing, sales methods, customers or Qualified Prospective Customers (including, without limitation, the names, addresses or telephone numbers of such customers or Qualified Prospective customers), technology, programs, finances, costs, employees (including without limitation, the names, addresses or telephone numbers of any employee), employee compensation rates or policies, marketing plans, development plans, computer programs, computer systems, inventions, developments, trade secrets, know how or confidences of the Company or the Company's business, without regard to whether any of such Confidential Information may be deemed confidential or material to any third party, and the Company and the Shareholder hereby stipulate to the confidentiality and materiality of all such Confidential Information.  The Shareholder acknowledges that all of the Confidential Information is and shall continue to be the exclusive proprietary property of the Company, whether or not prepared in whole or in part by the Shareholder and whether or not disclosed to or entrusted to the custody of the Shareholder.  The Shareholder agrees that upon the termination of the Shareholder's employment with the Company for any

reason, the Shareholder will return promptly to the Company all memoranda, notes, records, reports, manuals, pricing lists, prints and other documents (and all copies thereof) relating to the Company's business which he may then possess or have within the Shareholder's control, regardless or whether any such documents constitute Confidential Information. The Shareholder further agrees that he shall forward to the Company all Confidential Information which at any time (including after the period of his employment with the Company) should come into the Shareholder's possession or the possession of any other person, firm or entity with which the Shareholder is affiliated in any capacity.

(Exhs. 12, 13, 14 and 15.)

60.     Pursuant to the administrative services agreement, MHM uses the CBIZ BVKT computer system. (Exh. 2, Restated Administrative Services Agreement; Exh. 34, Thurston Dep. 16:13-15.) The CBIZ BVKT computers contained MHM documents and information. (Exh. 18, Krier 1/14/09 Dep. 38:23-39:9.)

61.     Defendants had access to a substantial amount of confidential MHM client information on the firm computers. Defendant also had access to information about the salaries and anticipated raises for MHM employees.

62.     MHM considers its client lists, addresses and contact information to be confidential. (Exh. 1, Tr. 44:10-13.)

63.     MHM also considers the following property of MHM to be confidential information: work programs that describe approaches used on audit engagements; memoranda regarding technical decisions; decisions on accounting and audit matters; overall audit methodology; and sampling plans, policies and procedures on the conduct of an audit practice. (Exh. 1, Tr. 40:3-16.) MHM uses a commercial software product known as "Caseware." MHM's Caseware has been tailored considerably for MHM. (Exh. 1, Tr. 44:17-45:7.)

64.     MHM takes steps to preserve and protect the confidentiality of its

information.  (*See* Exh. 1, Tr. 44:3-9.)  For example, MHM protects information with

passwords, locks files, and informs its employees about confidentiality.  In addition,

MHM maintains a repository for electronic documents, all of which are considered

confidential.

65.     After defendants tendered their resignations from CBIZ BVKT and MHM,

CBIZ BVKT's and MHM's counsel engaged Mark Lanterman, Chief Technology

Officer for Computer Forensic Services, Inc. ("CFS") to investigate any unusual activity

on CBIZ BVKT computers, to examine external storage devices in the possession of

BWK employees, and to examine computers and devices in use at BWK.  (Exh. 50 at 1,

3, Expert Report of Mark Lanterman.)

66.     On September 12, 2008, CFS personnel acquired the hard drives from 19

computers, a RAID array (a "redundant array of independent disks"), an external hard

drive and four USB flash drives for imaging.  In this case, the RAID array is the BWK

server.

67.     The parties agreed upon search terms and a search protocol to be used by

CFS in searching the computers obtained.  These terms include:  CBIZ (including

Century Business Services, Inc.); MHM (including Mayer Hoffman McCann); BVKT

(including Bertram, Vallez, Kaplan, Talbot); and SK&B (including SK&B Business

Services).[2]

68.     On August 1, 2008, Defendant Krier inserted a thumb drive into his CBIZ

BVKT laptop and downloaded Caseware files and other business files.  (Exh. 4, Krier

---

[2] "SK&B" refers to a CBIZ entity which offices in downtown Minneapolis.  CBIZ BVKT and MHM's New Hope office moved to the CBIZ SK&B office in August 2008.

8/29/08 Dep. 37:5-38:13.)  Caseware is an engagement software MHM uses to manage its files.  (Exh. 4, Krier 8/29/08 Dep. 75:8-13; Exh. 5, Stelzer 8/28/08 Dep. 100:4-9.)

69.     On July 29, 2008, defendant Barton downloaded from his CBIZ BVKT computer and onto a flash drive contact information that he had previously used to access information to contact clients, including MHM clients.  (Exh. 3, Barton 8/29/08 Dep. 57:21-24, 98:22-99:15.)

70.     On July 31, 2008, defendant Walter copied various Excel spreadsheets that had been done over time at the firm from his work laptop onto a thumb drive.  (Exh. 6, Walter 8/28/08 Dep. 72:8-73:5.)  Mr. Walter uploaded a spreadsheet pertaining to a client onto his home computer.  (Exh. 6, Walter 8/28/08 Dep. 72:23-74:6.)

71.     On August 1, 2008, Mr. Walter removed redwelds from the office that contained the original files of an MHM client.  (Exh. 6, Walter 8/28/08 Dep. 76:21-77:21.)

72.     Defendant Stelzer downloaded files, including tax files, Excel files, an Outlook calendar, and some Caseware files, from his work computer onto a flash drive in the last week or two before his departure from MHM.  (Exh. 5, Stelzer 8/28/08 Dep. 99:12-14, 100:4-6.)  Mr. Stelzer also downloaded templates and forms.  (Exh. 5, Stelzer 8/28/08 Dep. 100:10-13.)

73.     One of the thumb drives examined by Mr. Lanterman had been used to copy information from Mr. Stelzer's CBIZ computer onto the thumb drive.  (Exh. 1, Tr. 137:12-138:25.)  The information copied included Caseware backup files for approximately 46 clients.  (*Id.*)

74.     Prior to August 1, 2008, Lance Bolson was employed by CBIZ BVKT as its controller.  (Exh. 46, Bolson Dep. 10:11-16.)  Within a week or two before Mr. Bolson left CBIZ BVKT on August 4, 2008, he plugged a personal external hard drive into the CBIZ server and copied "all the client data that [he] could."  (Exh. 46, Bolson Dep. 20: 6-21:12.)  Mr. Bolson took the external hard drive with him and copied the data onto another external hard drive.  (Exh. 46, Bolson Dep. 21:13-20.)  Mr. Bolson copied the data because "we were leaving and because I thought that client information might be valuable to the new firm."  (Exh. 46, Bolson Dep. 21:6-9.)

75.     The servers at BWK were placed in service, at the earliest, on August 11, 2008, four days after the entry of the temporary restraining order.  (Exh. 84, Bolson Dep. 41:2-5.)

76.     Mr. Bolson copied data wholesale from the external hard drive to BWK servers, including CBIZ BVKT and MHM confidential information.  Mr. Bolson also forwarded every e-mail he had received for several years at CBIZ, including e-mails related to MHM and CBIZ work, to other unspecified e-mail accounts.  (Exh. 46, Bolson Dep. 22:6-19, 37:8-38:14.)

77.     After receiving the two external drives from defendants, Mr. Lanterman examined them.  Both devices contained documents copied from the CBIZ BVKT computers.  (*See* Exh. 50 at 3, 6, Expert Report of Mark Lanterman.)  One of the hard drives had "hundreds" of documents copied from the CBIZ BVKT computers, most of which were copied to the device on August 14, 2008.  (Exh. 50 at 6, Expert Report of Mark Lanterman.)

78. Kristie Hassebroek worked for CBIZ BVKT since November 1, 2004. (Exh. 48, Hassebroek Dep. 9:5-6.)

79. The forensic examination of Ms. Hassebroek's BWK computer showed that her computer was successfully connected to the CBIZ Exchange server at 11:52 a.m. on August 21, 2008 accessing an account called "Jim Stelzer." (Exh. 50 at 5, Expert Report of Mark Lanterman.) Four minutes later, approximately 400 CBIZ emails and 37 CBIZ document files were copied to Ms. Hassebroek's computer from the CBIZ server. (*Id.*)

80. Mr. Lanterman ruled out that the files were copied from a CD or thumb drive onto Ms. Hassebroek's computer. Mr. Lanterman was not able to rule out that the files had been downloaded from an ftp ("file transfer protocol") internet site.

81. Ms. Hassebroek testified that she accessed the CBIZ ftp site after she began working for BWK. (Ex. 48, Hassebroek Dep. 23:5-24:16.)

82. Mr. Lanterman also determined that an account called "khassebroek" successfully connected to the CBIZ Exchange email server at 3:11 p.m. on August 21, 2008. (Exh. 50 at 5, Expert Report of Mark Lanterman.)

83. Applying the search terms agreed upon by the parties, Mr. Lanterman located approximately 1,500 files and 64,000 emails containing one or more of the search terms on the BWK computers. (Exh. 50 at 3-4, Expert Report of Mark Lanterman.) Most of the files are documents and emails that contained CBIZ and MHM confidential information and were found on an external hard drive and the BWK server. (Exh. 50 at 3-4, Expert Report of Mark Lanterman; Trial Testimony of Tim Talbot.)

84.     The documents found on the BWK server included Word versions of financial statements with the accountant's review report attached and completed client information forms for MHM clients.  Defendants did not receive such documents from their clients.  Mr. Talbot testified that these documents are considered confidential by MHM and that MHM would not provide to a client the financial statement with the report attached in a form (such as a Word document or Excel spreadsheet) that could be altered by the client.  In addition, MHM did not provide this information to clients electronically.

85.     Mr. Lanterman also examined an external hard drive that was used to back up the BWK server.  Documents found on this external hard drive included a schedule of client billings for MHM's Minneapolis office, Caseware Instructor's Manual (MHM PC Edition), and a summary of the New Hope payroll budget for 2008.  MHM considers client billing and payroll information as confidential.  The Caseware software, as modified and tailored by MHM, and manuals are also proprietary to MHM.

86.     The file log provided to counsel by CFS showed that MHM Caseware files, which were last modified before BWK servers were ever operational, were first saved to the BWK server as late as September 9, 2008.

87.     By the time of trial, Mr. Lanterman had not received all devices used with the computers he examined.

88.     Defendants retained Patrick Gibson to delete items found by CFS on the BWK and defendants' computers.  Mr. Gibson deleted files listed on the logs provided by CFS.  In spite of the two-month delay between the time CFS imaged the BWK computers and the time Mr. Gibson began deletion, Mr. Gibson made no attempt to

determine whether any files had been renamed, copied to an external storage device, e-mailed, or copied to a new directory.  Mr. Gibson did not search BWK's back-up tapes for MHM files.

89.     Each defendant knowingly and intentionally breached the Stockholder's Agreement by willfully taking MHM's confidential information.

*Damages*

90.     In relevant part, section 5.4(b) of the Liquidated Damages provision of the Stockholder's Agreement states,

> The Shareholder agrees that, in the event any revenues become payable to the Shareholder or to any other person[,] firm or entity with which the Shareholder is affiliated in any capacity, as a result of a violation by the Shareholder of any of the covenants contained in this Agreement, the Shareholder shall pay to the Company, or shall cause the person, firm or entity with which Shareholder is affiliated to pay to the Company, an amount equal to the damages calculated pursuant to the shareholder's Executive Employment Agreement or other contractual arrangements with CBIZ shall apply.

(Exhs. 12, 13, 14 and 15.)

91.     The liquidated damages provision was agreed by the parties to be the reasonable value of the loss of a client and was not intended to "discipline" shareholders or tell shareholders what it would cost them to leave MHM.  (Exhs. 30, 32 § 3; Exh. 26, Hancock 1/26/09 Dep. 92:20-93:2.)

92.     The liquidated damages provision in defendant Barton's Executive Employment Agreement provides:

> The Executive acknowledges and agrees that in the event of any breach by the Executive of any of the covenants contained in this Agreement, the actual dollar loss to the Company and Century will be impossible to calculate.  Therefore, the Executive agrees that, in addition to any equitable remedy available to the Company or Century, in the event any gross revenues, earnings, commissions, payments or fees (including,

without limitation, any override commissions or expense allowances) become payable to the Executive or to any other person, firm or entity with which the Executive is affiliated in any capacity, as a result of a violation by the Executive of any of the covenants contained in this Agreement, the Executive shall pay to the Company or its designee, or shall cause the person, firm or entity with which Executive is affiliated to pay to the Company or its designee, an amount equal to the greater of (A) one hundred percent (100%) of such gross revenues, earnings, commissions, payments or fees (including, without limitation, any override commissions or expense allowances) that become payable to the Executive or to any other person, firm or other entity with which the Executive is affiliated in any capacity, as a result of a violation by the Executive of any of the covenants contained in this Agreement, during the two (2) year period prior to such violation, and (B) one hundred percent (100%) of such gross revenues, earnings, commissions or expense allowances) that become payable to the Executive or to any other person, firm or other entity with which the Executive is affiliated in any capacity, as a result of a violation by the Executive of any of the covenants contained in this Agreement, during the two (2) year period following such violation as liquidated monetary damages and not as a penalty.

(Exh. 29.)

93.    The Confidentiality Agreement executed by Stelzer, Krier and Walter

provides:

Because of damage that the Corporation will sustain by reason of the breach of the foregoing non-solicitation provision, Employee agrees to pay to the Corporation, as liquidated damages, the reasonable value of the loss of the Client to the Corporation, in an amount equal to the greater of (A) one hundred percent (100%) of the gross revenues, commissions, payments, fees or other money received (whether or not collected as of the end of the period specified in this subsection (A)) by the Corporation during the twenty-four (24) month period preceding the date such Client ceases to be a client of the Corporation or the Firms, or (B) one hundred percent (100%) of the gross revenues, commissions, payments, fees or other money received (whether or not collected as of the end of the period specified in this subsection (B)) by Employee (or any family member of Employee), or by an entity that Employee (or a family member of such Employee), renders services to or that is owned, in whole or in part by Employee (or any family member of Employee) during the twenty-four (24) month period following the date such Client ceases to be a client of the Corporation of the Firms. The Corporation shall have the right, to the extent permitted by law, to offset the sum which Employee is required to pay to the Corporation under this provision against any sum due or to become due to Employee.

(Exhs. 30, 31, 32 § 3.)

94.      After the defendants left MHM, MHM lost clients and four employees that were solicited by defendants to move to BWK.

95.      The conduct of the defendants has harmed MHM's reputation and tarnished the good will of MHM.  Defendants' conduct has created confusion amongst MHM's clients.  (Exh. 1, Tr. 45:24-46:19.)

96.      The departure of the four MHM employees, Ms. Bethke, Ms. Brown, Ms. Clark, and Mr. Klemmensen, sent negative messages to clients and had a negative effect on recruiting efforts.  (Exh. 26, Hancock 1/26/09 Dep. 40:15-41:13.)  Damages from these types of harm are not easy to quantify.

97.      At trial, MHM provided a calculation of damages pursuant to the liquidated damages provisions in the relevant agreements.  (*See* Exhibit A attached hereto (Trial Exh. Amended 216).)  Defendants stipulated that they had solicited each client identified in the calculation.  Each defendant admitted in his sworn Interrogatory answers that he solicited all clients.

98.      From August 1, 2006 through July 31, 2007, MHM's gross fee billings to clients solicited by defendants equaled $692,905 and from August 1, 2007 through July 31, 2008, the gross fees billed to clients solicited by defendants equaled $672,859. BWK billings showed that defendants provided services to one Qualified Prospective Customer and billed $4,158 to that client.  Under the liquidated damages provisions of the relevant contracts, the total amount of fees due as damages is $1,369,921.

99.      For each defendant, Ms. Thurston prepared a set of the "Valued Clients" letters for clients, with the initials of the defendant responsible for the clients on each

page indicated at the top of the document. (Trial Exh. 5.) Clients not identified on Ms.

Thurston's list have been linked to specific defendants through the engagement letters.

(Trial Exh. 113 at DEFDEP 017, 027, 035, 063, 069, 98, 106, 115, 117, 136, 151, 152;

Trial Exh. 114 at MHM0012222-23).

100. Evidence from testimony and exhibits showed the billings for clients

solicited by Mr. Barton total $344,414.00 as follows:

| | | | | |
|---|---|---|---|---|
| 2 | BVK3187.ATT | AcornCreek, Inc. | 409 | 290 |
| 3 | BVK2935.ATT | Advanced MachiningTechnologies, Inc. | 2,365 | 1,484 |
| 4 | BVK2240.ATT | Air Mechanical, Inc. | 1,980 | 3,751 |
| 6 | BVK0002.ATT | Air Power Equipment Corp. | 5,125 | 5,869 |
| 13 | BVK1735.ATT | Autonetic Industries, Inc. | 2,298 | 1,814 |
| 17 | BVK3034.ATT | Bercom International, LLC | 2,879 | 3,701 |
| 18 | BVK1891.ATT | Blaine Brothers Maintenance | 8,800 | 8,819 |
| 21 | BVK3076.ATT | Brockton Woods Developers, LLC | 602 | 312 |
| 22 | BVK1717.ATT | Builders' Carpet | 12,040 | 12,536 |
| 23 | BVK2932.ATT | Carlson Building Services, Inc. | 893 | 0 |
| 24 | BVK2882.ATT | CarpetMax Design Studio | 0 | 0 |
| 25 | BVK3019.ATT | CarTika Medical, Inc. | 7,365 | 4,147 |
| 26 | BVK2869.ATT | CD Tile & Stone, Inc. | 3,462 | 3,508 |
| 28 | BVK1358.ATT | Crane Engineering, Inc. | 5,443 | 3,420 |
| 29 | BVK2877.ATT | Creek Hill Custom Homes, Inc. | 1,355 | 664 |
| 34 | BVK2878.ATT | Delgany Developers LLC | 602 | 332 |
| 37 | BVK3152.ATT | Direct Digital Controls, Inc. | 5,191 | 3,180 |
| 39 | BVK2399.ATT | Division Stampings, Inc. | 2,669 | 1,418 |
| 42 | BVK2227.ATT | Ekon Powder Coatings | 4,927 | 4,017 |
| 52 | BVK1907.ATT | Haus Specialty Manufacturing | 2,520 | 2,175 |
| 53 | BVK2724.ATT | Heritage Millwork | 5,917 | 3,515 |
| 55 | BVK2368.ATT | Ideal Industries, Inc. | 2,634 | 1,651 |
| 56 | BVK1731.ATT | Insurance Advisors, Inc. | 4,423 | 5,284 |
| 57 | BVK2638.ATT | Jeske Electric, Inc. | 2,957 | 3,976 |
| 61 | BVK1333.ATT | King Technology | 7,990 | 6,223 |
| 66 | BVK3090.ATT | Long Lake Glass, Inc. | 550 | 206 |
| 68 | BVK0369.ATT | M & L Industries, Inc. | 5,136 | 2,193 |
| 71 | BVK2011.ATT | Marshall Manufacturing Company | 6,906 | 5,315 |
| 72 | BVK2874.ATT | Melanson Properties, LLC | 441 | 1,028 |
| 78 | BVK0725.ATT | Minncast, Inc. | 5,940 | 4,239 |
| 82 | BVK1268.ATT | Oakridge Builders | 6,464 | 2,550 |
| 91 | BVK3412.ATT | Progressive Engineering Technology | 11,348 | 0 |
| 93 | BVK1370.ATT | Pump and Meter Service, Inc. | 4,767 | 2,809 |
| 95 | BVK0715.ATT | Regal Machine, Inc. | 5,569 | 6,502 |
| 97 | QPC* | Roofing Industry Fund of Minnesota, Inc. | | 4,158 |

| 98 | BVK2366.ATT | Rotary Systems | 1,791 | 1,209 | |
| 100 | BVK3499.ATT | Safety and Injured Workers' Rehabilitation Fund | 668 | 0 | |
| 103 | BVK2254.ATT | Smarca, Inc. | 3,514 | 5,347 | |
| 105 | BVK3017.ATT | Specialty Contracting - East Metro | 2,784 | 3,884 | |
| 106 | BVK3314.ATT | Specialty Contracting Services - Madison, LLC | 2,890 | 4,914 | |
| 107 | BVK0349.ATT | Specialty Contracting Services, Inc. | 4,699 | 5,507 | |
| 113 | BVK3188.ATT | SunriseRidge, Inc. | 409 | 290 | |
| 114 | BVK1336.ATT | Superior Construction Services, Inc. | 4,471 | 3,517 | |
| 122 | BVK2247.ATT | U.M.C., Inc. | 9,806 | 7,910 | |
| 123 | BVK3283.ATT | U.M.C., Inc. 401K Plan | 9,463 | 18,294 | |
| | | | 182,460 | 157,797 | 4158 |

101.	Evidence from testimony and exhibits showed the billings for clients solicited by Mr. Walter total $299,485.00 as follows:

| 8 | BVK2773.ATT | Allied Vaughn Retirement Savings Plan | 8,466 | 9,067 |
| 11 | BVK2473.ATT | Ardel Manufacturing and Engineering, Inc. | 3,076 | 2,803 |
| 12 | BVK2545.ATT | Automated Conveying Systems, Inc. | 3,232 | 2,511 |
| 14 | BVK1463.ATT | Backes Companies, Inc. | 911 | 0 |
| 16 | BVK2892.ATT | Baldwin Supply Co. | 58,586 | 51,957 |
| 19 | BVK1405.ATT | Bralico Commercial, Inc. | 625 | 596 |
| 20 | BVK0030.ATT | Bralico Farming, Inc. | 3,030 | 4,226 |
| 27 | BVK1974.ATT | Classic Construction, Inc. | 1,703 | 4,922 |
| 30 | BVK1890.ATT | Custom Door Sales, Inc. | 190 | |
| 35 | BVK1940.ATT | Delta Industrial Services, Inc | 7,717 | 6,017 |
| 36 | BVK1247.ATT | Diamond Lake Tool, Inc. | 2,979 | 2,740 |
| 44 | BVK3084.ATT | Ewings Associates | 2,181 | 1,813 |
| 63 | BVK1148.ATT | Landmark Concrete, Inc. | 3,419 | 3,212 |
| 67 | BVK0138.ATT | Luverco Farming, Inc. | 1,433 | 1,216 |
| 75 | BVK2979.ATT | Milestone Consulting, Inc. | 2,561 | 2,537 |
| 81 | BVK0157.ATT | New Hope Animal Hospital | 3,516 | 2,923 |
| 86 | BVK3455.ATT | Padelford Packet Boat Co., Inc. | 5,335 | 0 |
| 88 | BVK2255.ATT | Plymouth Heights Pet Hospital | 2,529 | 2,939 |
| 89 | BVK1371.ATT | Powder Coating Technologies | 1,664 | 1,492 |
| 102 | BVK0255.ATT | SH Real Estate, LLC | 6,380 | 4,488 |
| 109 | BVK1294.ATT | St. Croix Boat & Packet Co. | 5,533 | 2,312 |
| 115 | BVK3463.ATT | Technical Plating, Inc. | 3,193 | 0 |
| 116 | BVK2929.ATT | Tecnifoam, Inc. | 4,071 | 3,252 |
| 118 | BVK2539.ATT | The New French Bakery, Inc. | 16,295 | 9,323 |

| 120 | BVK0639.ATT | Twin City Gear Company | 4,637 | 4,778 |
| 121 | BVK1408.ATT | Twin City Gear Grinding, Inc. | 2,131 | 1,543 |
| 124 | BVK1482.ATT | Unity Tool, Inc. | 4,596 | 5,724 |
| 125 | BVK0233.ATT | Upper Midwest Management Corp. | 4,073 | 3,036 |
| | | | 164,059 | 135,426 |

102. Evidence from testimony and exhibits showed the billings for clients
solicited by Mr. Krier total $310,920.00 as follows:

| 1 | BVK2585.ATT | ACI Asphalt Contractors, Inc. | 2,885 | 3,975 |
| 9 | BVK1827.ATT | American Machine & Gun Drilling | 3,498 | 5,068 |
| 10 | BVK0014.ATT | Anoco Metal Services, Inc. | 3,355 | 3,890 |
| 32 | BVK0037.ATT | D & M Iron Works, Inc. | 3,211 | 4,042 |
| 33 | BVK1818.ATT | Dave Regel Construction, Inc. | 0 | 6,407 |
| 38 | BVK1592.ATT | Diversified Companies, Inc. | 2,527 | 2,968 |
| 40 | BVK1317.ATT | Down in the Valley, Inc. | 4,494 | 4,511 |
| 41 | BVK2776.ATT | Eagle Window Distributing Company | 831 | 1,910 |
| 45 | BVK2423.ATT | Fair's Garden Center | 4,468 | 3,166 |
| 46 | BVK2971.ATT | Farmers Development, Inc. | 0 | 354 |
| 48 | BVK3230.ATT | First Premier Capital, LLC | 43,915 | 38,602 |
| 50 | BVK2612.ATT | Gonyea Development LLC | 5,299 | 775 |
| 51 | BVK2709.ATT | Gonyea Development Two, LLC | 0 | 238 |
| 58 | BVK1393.ATT | Jonco Die Company | 5,758 | 4,946 |
| 60 | BVK3248.ATT | KHC Construction, Inc. | 10,893 | 14,668 |
| 76 | BVK3310.ATT | Milestone Systems, Inc. | 4,546 | 3,170 |
| 83 | BVK2967.ATT | Olsen Fire Inspection, Inc. | 3,814 | 4,668 |
| 84 | BVK2963.ATT | Olsen Fire Protection, Inc. | 3,893 | 4,411 |
| 85 | BVK1086.ATT | Packaging Systems Automation | 12,114 | 13,344 |
| 92 | BVK2007.ATT | Progressive Systems, Inc. | 7,021 | 4,472 |
| 94 | BVK0945.ATT | Rayco Construction, Inc. | 4,569 | 5,033 |
| 99 | BVK2250.ATT | Safe Reflections, Inc. | 2,596 | 7,200 |
| 101 | BVK1147.ATT | Scandia Kitchens, Inc. | 2,978 | 2,585 |
| 126 | BVK2274.ATT | Walker In Store | 4,059 | 2,001 |
| 127 | BVK2206.ATT | Waymouth Farms EBP | 5,515 | 15,251 |
| 128 | BVK2103.ATT | Waymouth Farms, Inc. | 6,090 | 4,936 |
| | | | 148,329 | 162,591 |

103. Evidence from testimony and exhibits showed the billings for clients
solicited by Mr. Stelzer total $415,102.00 as follows:

| 7 | BVK1557.ATT | Allan Mechanical, Inc. | 2,319 | 4,328 |
| 15 | BVK2922.ATT | Bakken Building & Remodeling, Inc. | 6,290 | 1,885 |

| | | | | |
|---|---|---|---|---|
| 31 | BVK2923.ATT | D & J Proprietors | | 31 |
| 43 | BVK0061.ATT | Evelands Inc. | 2,856 | 2,516 |
| 47 | BVK3074.ATT | Final Touch Excavating, Inc. | 7,893 | 3,010 |
| 49 | BVK1214.ATT | FSS, Inc. | 14,550 | 8,786 |
| 54 | BVK2554.ATT | Hoosier Tire North, Inc. | 2,909 | 1,670 |
| 59 | BVK1264.ATT | Joyner's Die Casting & Plating | 7,617 | 6,629 |
| 62 | BVK3325.ATT | Lake Country Builders, LTD. | 3,921 | 9,603 |
| 64 | BVK1877.ATT | Leick-Lineer Properties, Inc. | 3,512 | 3,261 |
| 69 | BVK2138.ATT | Mactech, Inc. | 9,046 | 0 |
| 70 | BVK1505.ATT | Mark II of Fosston | 4,386 | 5,676 |
| 73 | BVK2876.ATT | Midwest Medical 401(k) | 6,512 | 14,304 |
| 74 | BVK2930.ATT | Midwest Medical Holdings, LLC | 33,186 | 94,515 |
| 77 | BVK1515.ATT | Miller Excavating, Inc. | 3,697 | 2,831 |
| 79 | BVK3085.ATT | MJK Real Estate Fund II, LLC | 3,213 | 4,061 |
| 80 | BVK2933.ATT | MJK Real Estate Fund, LLC | 10,750 | 10,750 |
| 87 | BVK3059.ATT | PharmacyONE, LLC | 1,022 | 1,268 |
| 90 | BVK3000.ATT | Production Stamping, Inc. | 7,024 | 5,652 |
| 96 | BVK1825.ATT | Reprocessing Products Corporation (RPC) | 5,550 | 3,170 |
| 104 | BVK1593.ATT | Southside Family Nurturing Ctr | 16,068 | 24,385 |
| 108 | BVK0199.ATT | SPSI, Inc. | 6,999 | 5,101 |
| 110 | BVK2315.ATT | Strategic Fundraising, Inc. | 5,381 | 8,287 |
| 112 | BVK2140.ATT | Stresstech, Inc. | 1,913 | 0 |
| 117 | BVK1779.ATT | The Bindery, Inc. | 3,705 | 7,011 |
| 119 | BVK2954.ATT | Tom Fisher Enterprises, Inc. | 0 | 141 |
| 129 | BVK3236.ATT | Woodline Manufacturing, Inc. | 7,692 | 8,224 |
| | | | 178,011 | 237,091 |

## *Court Proceedings*

104.    On August 7, 2008, MHM filed its Verified Petition in the Circuit Court

of Jackson County, Missouri, alleging four counts of breach of contract against all four

defendants.  MHM alleged that defendants breached the Stockholder's Agreement when

they (1) solicited MHM customers; (2)  solicited MHM employees; (3) used and

disclosed MHM's confidential information; and (4) commenced litigation against MHM

in a jurisdiction other than that specified in the Stockholder's Agreement.[3]

105.    On August 7, 2008, MHM filed a Motion for Temporary Restraining

Order, which the court granted that same day.  The court enjoined defendants from

---

[3]        Defendants dismissed the litigation initiated in Minnesota state court, and MHM has not pursued the fourth count.

soliciting MHM's customers and employees, and from using trade secrets or confidential

information obtained from MHM. The court also ordered defendants to return all of

MHM's trade secrets or confidential information in their possession, custody or control.

106. On August 11, 2008, Defendants removed this action to the United States

District Court for the Western District of Missouri.

107. After an evidentiary hearing held on September 2, 2008, this Court

entered a Preliminary Injunction, enjoining defendants from:

> (1) Directly or indirectly soliciting, attempting to solicit, or causing to be solicited, taking away, attempting to take away, or otherwise interfering with MHM's relationship with any customer or Qualified Prospective Customer as these terms are used in the Stockholders Agreement; and

> (2) Soliciting any additional attest services to any customer or Qualified Prospective Customer as these terms are used in the Stockholders Agreement; and

> (3) Directly or indirectly, soliciting (or attempting to solicit), inducing (or attempting to induce), causing or facilitating any employee, director, agent, consultant, independent contractor, representative or associate of MHM to terminate his, her or its relationship with MHM or, soliciting (or attempting to solicit), inducing (or attempting to induce), causing or facilitating any supplier of services or products to MHM to terminate or change his, her or its relationship with MHM or otherwise interfere with any relationship between MHM and any of MHM's suppliers of products or services; and

> (4) Using any trade secrets or confidential information obtained during their employment with MHM.

(Doc. 21.) The Court ordered defendants to return MHM's trade secrets and confidential

information that remained in their possession, custody or control, keeping no copy for

themselves. The Court further ordered that "defendants provide immediate access to

BWK's computers and servers and the home computers of defendants and their

employees for inspection by a computer forensic expert," without deleting or transferring any data from the computers until images have been made. (*Id.*)

## CONCLUSIONS OF LAW

### I.     BREACH OF CONTRACT

108.     This Court has subject matter jurisdiction over the breach of contract claims in this case pursuant to 28 U.S.C. § 1332.  Plaintiff MHM is a professional corporation duly organized under the laws of the State of Missouri with its principal place of business located in Kansas.  Defendants are all citizens and residents of Minnesota.  The matter in controversy exceeds $75,000.

109.     Pursuant to the agreement between the parties, the Stockholder's Agreement is governed by Missouri law.

110.     To succeed on a claim for breach of contract, a plaintiff must show: (1) the existence of a contract and its terms; (2) that plaintiff performed or tendered performance; (3) that defendant did not perform; and (4) that defendant's failure to perform caused plaintiff damage.  *Venable v. Hickerson, Phelps, Kirtley & Assocs., Inc.*, 903 S.W.2d 659, 665 (Mo. Ct. App. 1995).

#### A.     Existence of a Contract

111.     The Stockholder's Agreement and other relevant agreements are legal and binding.

112.     Missouri courts may enforce any promise imposing a restraint that is ancillary to a valid transaction or relationship.  *See, e.g.*, *AEE-EMF, Inc. v. Passmore*, 906 S.W.2d 714, 718-19 (Mo. Ct. App. 1995) (enforcing noncompete agreement in stock re-purchase agreement); *Gold v. Holiday Rent-A-Car Int'l, Inc.*, 627 F. Supp. 280, 282

(W.D. Mo. 1985) (enforcing noncompete agreement in rental car franchise agreement); *Renal Treatment Ctrs. – Missouri, Inc.*, 945 S.W.2d 557, 563-64 (Mo. Ct. App. 1997) (finding non-compete agreements applicable to an independent contractor relationship).

113.    The Stockholder's Agreement here was part of a simultaneously executed bundle of agreements that comprised the transactions of August 15, 2005. The defendants comprised four of the five members of Bertram Vallez. Bertram Vallez and MHM exchanged mutual promises in the Termination Agreement as valuable consideration. Bertram Vallez agreed to discontinue doing business and transfer client work papers to MHM. In exchange, MHM promised to (1) provide accountancy services to the clients as of August 15, 2005; (2) retain the client files for at least seven years; (3) make the files available to Bertram Vallez and its owners upon reasonable notice; and (4) provide insurance coverage for at least six years. MHM also agreed to pay Bertram Vallez's $75,000 obligation to a departing shareholder.

### 1.    *Consideration*

114.    "[A] contract that contains mutual promises imposing some legal duty or liability on each promissory is supported by sufficient consideration to form a valid, enforceable contract." *Sumners v. Serv. Vending Co.*, 102 S.W.3d 37, 41 (Mo. Ct. App. 2003).

115.    Missouri recognizes that an employer's obligation to repurchase shares can be sufficient consideration to support enforcement of a restrictive covenant. *See AEE-EMF, Inc. v. Passmore*, 906 S.W.2d 714, 718 (Mo. Ct. App. 1995) (finding a noncompete agreement within an agreement to purchase key-man life insurance and a stock re-purchase agreement enforceable).

116.     The Stockholder's Agreement contains such mutual promises—defendants agreed, among other things, not to solicit customers of MHM for a specified period of time (five years for defendant Barton and two years for defendants Stelzer, Krier and Walter), and MHM agreed to permit the defendants to become MHM shareholders and to repurchase their stock if they terminated their employment.  Moreover, defendants received compensation for services provided on behalf of MHM, and a vast array of benefits from MHM[4] for signing the Stockholder's Agreement.  The Stockholder's Agreement is supported by sufficient consideration.

117.     Defendants' reliance on *Sturgis Equipment Co. v. Falcon Industrial Sales Co.*, 930 S.W.2d 14, 17 (Mo. Ct. App. 1996), is misplaced.[5]  The agreement in *Sturgis* was solely an agreement to repurchase stock, nothing else.  The Stockholder's Agreement here was an agreement among the shareholders in which the firm agreed to re-purchase shares in exchange for the shareholder's promise to abide by the restrictive covenants.  In addition, the Stockholder's Agreement included MHM's promise that all shareholders of MHM will execute the same Stockholder's Agreement.

118.     *Sturgis* did not hold that an employer's promise to repurchase stock is insufficient consideration for a covenant not to compete.  *Id.* at 16-17.  Instead, the court found that the employer did not have a protectable interest in customer contacts because the former employee had "very little contact" with customers and thus had minimal influence over them.  *Id.* at 17.  Rather, as the Court of Appeals later pointed out, "[t]he essence of the holding [in *Sturgis*] is that the evidence did not support a finding of knowledge of trade secrets or of customer contact sufficient to support a restrictive

---

[4]          Such benefits included access to national marketing plans, national level training, malpractice insurance and the access to clients in other states.
[5]          The Court also notes that *Sturgis* in not a decision of the highest court of the state.

covenant, and so did not justify any kind of restriction." *Alltype Fire Prot. Co. v. Mayfield*, 88 S.W.3d 120, 124 (Mo. Ct. App. 2002) (analyzing *Sturgis*).

119.   Furthermore, *Sturgis* involved a broad covenant not to compete that the court deemed more extensive than required for the employer's protection. *Sturgis*, 930 S.W.2d at 17.  By contrast, the Stockholder's Agreement here restricts only solicitation of MHM's customers while leaving defendants otherwise free to compete with MHM.

120.   The Stockholder's Agreement is far more than just a "buy/sell arrangement;" it is a mutual agreement among all shareholders, for the benefit and protection of MHM and all its shareholders, that departing shareholders will not solicit MHM clients or raid its employees when they leave.  As such, the Stockholder's Agreement differs from the agreement in *Sturgis* and is enforceable under Missouri law. *Lake Cable, Inc. v. Trittler*, 914 S.W.2d 431, 435 (Mo. Ct. App. 1996); *AEE-EMF, Inc.*, 906 S.W.2d at 718.

121.   The Stockholder's Agreement is supported by consideration.

### 2.   Protectable Interests

122.   A restrictive covenant between an employer and an employee under which the employer seeks to protect (1) confidential or trade secret business information or (2) customer or supplier relationships, goodwill, or loyalty is enforceable.  Mo. Rev. Stat. § 431.202(3).

123.   An employer has a legitimate interest in protecting its trade secrets and customer contacts. *Superior Gearbox v. Edwards*, 869 S.W.2d 239, 247 (Mo. Ct. App. 1993).

124.    Customer contacts are "the influence an employee acquires over his employer's customers through personal contact." *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 611 (Mo. banc 2006) (quoting *Schmersahl, Treloar & Co., P.C. v. McHugh*, 28 S.W.3d 345, 349 (Mo. Ct. App. 2000)).  The "quality, frequency, and duration" of the employee's relationship with the customers is a crucial consideration.  *Healthcare Servs. of the Ozarks*, 198 S.W.3d at 611.

125.    "The purpose of a non-compete agreement is 'to keep the covenanting employee out of a situation in which he might be able to make use of contacts with customers to his former employer's disadvantage.'" *Healthcare Servs. of the Ozarks*, 198 S.W.3d at 349 (quoting *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 75 (Mo. banc 1985)).

126.    Missouri courts have consistently found that where employees have substantial customer contacts, those customer relationships represent protectable interests even in the absence of other trade secrets or confidential customer information. *See, e.g.*, *Osage Glass*, 693 S.W.2d at 74; *see also Washington County Mem'l Hosp. v. Sidebottom*, 7 S.W.3d 542, 545 (Mo. Ct. App. 1999) ("[T]he employee's opportunity to influence customers justifies enforcement of the covenant.").

127.    Defendants' argument that MHM has no protectable interest in clients with whom they worked at Bertram Vallez or the client work papers because MHM paid no remuneration directly to defendants is without merit.[6]  The Missouri Court of Appeals recently addressed this question and soundly rejected defendants' position.  In *Naegele v. Biomedical Systems Corp.*, 272 S.W.3d 385, 388 (Mo. Ct. App. 2008), an employee

---

[6]        Because Missouri law does not require payment of remuneration for customer relationships developed with a different employer to be protected, these facts are immaterial.  *See Naegele*, 272 S.W.3d at 389.

argued that the plaintiff, her former employer, had no protectable interest in customer relationships she had developed prior to employment with plaintiff because the relationships "were not 'contributed as part of an equity investment in a business venture.'" *Id.* at 389. The court rejected the argument, stating that whether the employer purchased the customer contacts as part of an equity investment is immaterial. The court reasoned that the employer had the right to require development of strong relationships, and the record showed that the employer had invested time, money, and effort in allowing the employee to develop relationships. *Id.*

128. Defendant Stelzer testified that the relationship between the accountant and the customer was substantial. Defendants testified that a number of the clients they solicited had been their clients for years. Thus, MHM has protectable interests in its customer relationships.

129. The Court rejects defendants' argument that MHM has no protectable interests because the alternative practice structure violates federal or state antitrust laws. Defendants concede that this is not an antitrust case, and they have not pleaded it as such. *See* Fed. R. Civ. P. 8(c)(1). Moreover, defendants' arguments are conclusory and they have provided no evidence to support their allegations.

130. MHM's business model does not violate the state laws of Minnesota and Missouri. The Boards of Accountancy in Minnesota and Missouri have adopted the use of an alternative practice structure by adopting the AICPA Code of Ethics, which includes the alternative practice structure. *See* Mo. Rev. Stat. § 326.256.2 (adopting by reference the AICPA Code of Ethics); Minn. Stat. Ann. § 326A.02 (same); AICPA Ethics Interpretation 101-14 (approving the alternative practice structure at issue here).

### 3. Reasonableness (Time and Scope)

131. The restrictive covenant must be "reasonable as to time and geographic scope," and must be supported by consideration to be enforceable. *Superior Gearbox*, 869 S.W.2d at 247.

132. To determine reasonableness in restrictive covenants, courts consider the circumstances of the restriction, including subject matter, the purpose served, the situation of the parties, limits of the restraint, the specialization of the business involved, consideration supporting the restraint, threatened danger to the employer absent the restriction, and the economic hardship imposed on the employee. *Id.*

133. Defendants' argument that the Stockholder's Agreement is unreasonable because it restricts clients from selecting the accountant of their choice is unsupported by fact or law.

134. Here, the Stockholder's Agreement is reasonable. It does not ban clients from using the accountant of their choice. Nor does the agreement ban defendants from working in their chosen profession. Instead, the Stockholder's Agreement prohibits defendants from soliciting MHM clients for a specific period of time. Such restrictions are reasonable under Missouri law.

135. The Missouri Court of Appeals has affirmed the enforceability of restrictive covenants involving accountants. *Schott v. Beussink*, 950 S.W.2d 621, 625 (Mo. Ct. App. 1997). In *Schott*, the court concluded that whether a restrictive covenant could be enforced turns on whether the covenant is "reasonable as to time and space"—not the particular profession in which the individual worked. *Id.*

136.     In *Schott*, the court noted that an earlier case involving accountants, *Dwyer, Costello & Knox, P.C. v. Diak*, 846 S.W.2d 742, 747 (Mo. Ct. App. 1992), "did not hold that covenants not to compete among accountants are against public policy." *Schott*, 950 S.W.2d at 626.  In *Schott*, the court found a restrictive covenant reasonable where accountants were "not denied the right to engage in the practice of accounting universally, but [were] prohibited from soliciting employer's clients . . ."  950 S.W.2d at 626.

### a.     *Time*

137.     The "overwhelming weight of case authority" in Missouri supports the enforceability of a two-year restriction in a covenant not to compete.  *Alltype Fire Prot. Co. v. Mayfield*, 88 S.W.3d 120, 123 (Mo. Ct. App. 2002) (citing *Osage Glass*, 693 S.W.2d at 75 (three-year restriction)); *AEE-EMF, Inc. v. Passmore*, 906 S.W.2d 714, 724 (Mo. Ct. App. 1985) (same).

138.     The time restrictions set forth in the Stockholder's Agreement and relevant CBIZ agreements are reasonable under Missouri law.

### b.     *Scope*

139.     A customer restriction may substitute for a geographical restriction in a noncompete agreement.  *See, e.g.*, *Sys. Bus. Servs., Inc. v. Bratten*, 162 S.W.3d 41, 51 (Mo. Ct. App. 2005) (barring former employee from soliciting clients of former employer without geographic restriction); *Kessler-Heasley Artificial Limb Co. v. Kenney*, 90 S.W.3d 181, 188 (Mo. Ct. App. 2002) (geographic restriction does not apply where injunction prohibits servicing former patients).  An injunction prohibiting the

former employee from providing services to former clients may be enforced during the time period established in a noncompete agreement. *See id.*

140. The scope of the restriction is limited to MHM clients, and thus is reasonable.

## B. Performance

141. MHM has fulfilled its obligations under the Agreement. Defendants became shareholders and enjoyed the benefits of that status and now that they have resigned, MHM is repurchasing the stock of the departing shareholders as required by the Agreement.

## C. Defendants' Breach of the Stockholder's Agreements

142. Defendants have breached three terms of the Agreement. They wrongfully (1) solicited customers of MHM; (2) solicited employees of MHM; and (3) copied, used and disclosed confidential information of MHM.

143. Section 5.1 of the Agreement adopted the time periods of the restrictive covenants in defendants' prior agreements with CBIZ. Under those agreements, defendants Walter, Krier and Stelzer agreed that for a period of two years they would not directly or indirectly solicit or attempt to solicit any of MHM's customers or qualified prospective customers. Defendant Barton agreed that he would not solicit MHM's customers or qualified prospective customers for a period of five years. Each defendant testified that he did solicit MHM customers. In doing so, defendants knowingly and intentionally violated their Stockholder's Agreements.

144. Under Section 5.2 of the Agreement, defendants agreed that they would not, at any time, directly or indirectly solicit or attempt to solicit employees from MHM.

Defendants do not dispute that they solicited MHM employees. Defendant Stelzer met with MHM employee Lori Clark on August 1, 2008 and offered her employment with BWK. On August 2, 2008, defendants jointly met with a group of potential employees, including MHM employees Ryan Klemmensen and Jennifer Bethke, and offered them employment with BWK. Later that same day defendant Stelzer contacted MHM employee Bridget Brown by telephone and offered her a job with BWK.

145. Where, as here, the evidence shows "that in making these contacts [with customers] [defendants] sought to maintain and establish further goodwill with these customers as a basis for future business," defendants have solicited in violation of the noncompete agreement. *Adrian N. Baker & Co. v. DeMartino*, 733 S.W.2d 14, 16 (Mo. Ct. App. 1987). Defendants also asked MHM employees to leave MHM and work for them. Such actions constitute knowing and intentional solicitation of employees in violation of the Stockholder's Agreement.

146. Finally, under Section 5.3, defendants agreed they would not directly or indirectly copy, disseminate, or use any "confidential information." Defendants also agreed to return promptly all documents relating to MHM's business as well as any confidential information that should come into their possession in the future. *Id.* Not only did defendants not return materials to MHM, before leaving MHM, they copied client files and other confidential information from MHM computers onto various storage devices. Defendants continued to possess MHM information on the BWK server, some of which was uploaded to the server as late as September 9, 2008, a full week after this Court ordered them to return all information. There is no reason to think

that but for the efforts of MHM in this case, defendants would have returned the information that they removed.

147.    Based on the evidence presented at trial, each defendant willfully breached his agreement not to copy, use or disclose confidential information.

148.    Furthermore, the work completed by Mr. Gibson is insufficient to assure that all MHM files have been removed from the BWK computer system.

**D.    Damages**

149.    A plaintiff in a breach of contract action can seek both damages and injunctive relief.  *See Home Shopping Club*, 989 S.W.2d at 180.  ("The remedy at law for damages and the remedy in equity for specific performance are not exclusive of each other, but are cumulative where the remedy at law is inadequate.").

150.    Liquidated damages clauses are enforceable under Missouri law.  *Diffley v. Royal Papers, Inc.*, 948 S.W.2d 244, 246 (Mo. Ct. App. 1997).

151.    The question is whether the parties intended the provision to be a form of compensation—liquidated damages—or a penalty designed to compel performance.  *Id.* at 247.  The Court heard no evidence to suggest the parties intended the provision to be a penalty.

152.    For a liquidated damages clause to be valid: "(1) the amount fixed as damages must be a reasonable forecast for the harm caused by the breach; and (2) the harm must be of a kind difficult to accurately estimate."  *Id.* at 246.  While the label attached to the provision may not be conclusive, "it is a circumstance to be considered when deciding whether the provision is to be considered liquidated damages or a penalty."  *Id.*

153.     A reasonable forecast of damages "must not be unreasonably disproportionate to the amount of harm anticipated when the contract was made." *Paragon Group, Inc. v. Ampleman*, 878 S.W. 2d 878 (Mo. Ct. App. 1994).  The court adopted Comment b to the Restatement (Second) of Contracts § 356 in *Paragon Group* as follows:

> The amount fixed is reasonable to the extent that it approximates the actual loss that has resulted from the particular breach, even though it may not approximate the loss that might have been anticipated under other possible breaches . . . .  Furthermore, the amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss.

*Paragon Group, Inc.*, 878 S.W. 2d at 881.

154.     Courts give less weight to the "reasonable forecast of harm" factor if it is more difficult at the time of contracting to determine the actual damages due to a breach. *Valentine's, Inc. v. Ngo*, 251 S.W.3d 352, 355 (Mo. Ct. App. 2008) (holding liquidated damages provision was valid and enforceable).  The liquidated damage provisions at issue satisfy both of these tests.

155.     MHM lost clients and employees as a result of defendants' solicitation in violation of the Stockholder's Agreement.  In addition to the value of lost clients, the loss of goodwill and damage to reputation that MHM has suffered constitute harm that is difficult to estimate accurately.  *See Home Shopping Club*, 989 S.W.2d at 180 (finding that loss of customers and customer resentment towards plaintiff would be difficult to quantify in terms of damages).  MHM has expended effort to investigate defendants' removal of its confidential information.

156.     The Court credits the undisputed evidence presented that the damages in this case are difficult to quantify.

157.     The Stockholder's Agreement points to the method of calculation found in the relevant CBIZ agreements to determine liquidated damages.  The Confidentiality Agreements entered into by defendants Walter, Krier, and Stelzer state that the employee agrees to pay the "reasonable value of the loss of the Client to the Corporation, in an amount equal to the greater of one hundred percent (100%) of the gross revenues, commissions, payments, fees or other money received (whether or not collected as of the end of the period specified . . . .") during the two-year period preceding the date the client ceases to be a client of MHM.  Defendant Barton's Executive Employment Agreement contains a similar provision, allowing recovery of "gross revenues, earnings, commissions, payments or fees (including, without limitation, any override commissions or expense allowances)" that become payable in the two years prior to the violation of the agreement.

158.     The liquidated damages provision in the Stockholder's Agreement, utilizes the same method of calculation as defendants' previous agreements with CBIZ. It is clear from the circumstances that the Stockholder's Agreement refers to MHM's fees.  The liquidated damages provision, including its reference to defendants' CBIZ agreement, is reasonable and binding under the circumstances herein.

159.     Because the liquidated damages provisions allow MHM to seek damages based on the greater of several measures, any differences in definition between gross revenues, earnings or fees is immaterial.

160.     MHM presented evidence of total billings between August 1, 2006 and July 31, 2008 to clients solicited by defendants.  The total owed to MHM for defendants'

breach of the Stockholder's Agreements under the liquidated damages provision of the relevant contracts is $1,369,921.

161.    Defendants' answers to Interrogatories state that each defendant solicited all clients. Based on their verified answers, the Court finds defendants jointly and severally liable for the liquidated damages in the amount of $1,369,921.00.

## II.    PERMANENT INJUNCTION

162.    The standard for granting a permanent injunction is essentially the same as for a preliminary injunction except that the movant must attain success on the merits. *Bank One v. Guttau*, 190 F.3d 847, 844 (8th Cir. 1999). Thus, to obtain a permanent injunction, a plaintiff must show: (1) actual success on the merits; (2) it faces irreparable harm; (3) the harm to it outweighs any possible harm to others; and (4) an injunction serves the public interest. *Id.* As set forth above, MHM has established that defendants breached the Stockholder's Agreement and has actual success on the merits.

163.    The loss of intangible assets, including reputation and good will, can constitute irreparable injury. *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) (damage to reputation and loss of goodwill); *Universal Underwriters Serv. Corp. v. Mech. Breakdown Prot., Inc.*, 2005 WL 1429759, at *6 (W.D. Mo. June 14, 2005). Where a defendant's solicitation creates "a real threat that his continued efforts will result in additional . . . customers switching" to the defendant's company, the former employer makes an adequate showing of irreparable injury. *Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931, 935 (8th Cir. 2002).

164.     Here the evidence presented showed that at least 124 MHM clients have moved their business from MHM to BWK after defendants solicited their business. MHM has shown evidence of irreparable injury.

165.     Enforcement of a restrictive covenant signed "knowingly and voluntarily" does not create harm to the defendants that outweighs the foreseeable harm to MHM. *See Emerson Elec. Co. v. Rogers*, 418 F.3d 841, 846 (8th Cir. 2005).

166.     Particularly in a case like this, "[w]here it is likely that one party will repeatedly breach a long-term contract, an injunction is an appropriate remedy." *Home Shopping Club, Inc. v Roberts Broad. Co.*, 989 S.W.2d 174, 180 (Mo. Ct. App. 1998).

167.     In considering whether public policy prohibits the enforcement of a noncompete agreement, the Missouri Court of Appeals observed that "a more fundamental public policy is served . . . by the preservation of the obligations of contracts." *Long v. Huffman*, 557 S.W.2d 911, 915 (Mo. Ct. App. 1977).  Enforcement of restrictive covenants prevents an employee from using customer contacts to the former employer's disadvantage. *Emerson Elec. Co.*, 418 F.3d at 845.

168.     Each defendant signed the Stockholder's Agreement knowingly and voluntarily.  Further, each defendants breached the Stockholder's Agreement knowingly and intentionally.  Thus, any harm to defendants does not outweigh the harm to MHM.

169.     The Missouri Court of Appeals has considered and rejected the argument that restrictions posed on accountants is against public policy because it limits the public's ability to seek services from a professional of their own choosing. *Schott*, 950 S.W.2d at 625.

170.     Prior to joining MHM in 2005, defendants had provided attest accounting services for a CPA firm with a similar model for seven years.  None of them believes that the practice model violated any of their obligations as CPAs, and none left MHM because of the alternative practice model.  The alternative practice model is plainly not against public policy.

171.     The entry of a permanent injunction is warranted in this case and not against public policy.

172.     In addition, in light of defendants' failure to ensure adequately the removal of all MHM files from their new firm's computer systems, the Court finds that an updated examination of the BWK computers and removal of any files at defendants' expense is warranted.

s/ Gary A. Fenner
Gary A. Fenner, Judge
United States District Court

DATED:  April 1, 2009